B. W. LOUGHEED & COMPANY, LTD., Respondent, *v.* YONE SUZUKI and Others, Copartners, Doing Business under the Firm Name of SUZUKI & COMPANY, Appellants.

First Department, April 30, 1926.

Brokers — shipbroker — action for commissions in procuring charter party — clause in original charter party providing for commission of five per cent " upon the signing hereof " was stricken out and clause " on monthly payment of hire " inserted — same practice had been followed with three prior charter parties — defendants were unable to deliver on stipulated date and charterer canceled — plaintiff was entitled to commissions only on actual pay received — delay in delivery was caused by congestion in ports and strikes and not by negligence of defendants — plaintiff cannot recover.

The plaintiff, a shipbroker, is not entitled to recover brokerage commissions on the full amount of a charter party, the charterer having canceled the charter for failure of the defendants to deliver the vessel on the agreed date, for the contract between the plaintiff and the defendants must be construed to give the plaintiff the right to commissions only upon money actually received by the defendants, since it appears that a clause in the original charter party providing for the payment of a commission of five per cent upon the gross amount of the charter " upon the signing hereof " was stricken out and there was inserted in place thereof a clause providing for the payment " on monthly payment of hire; " that the same practice had been followed by the plaintiff and defendants on the execution of three prior charter parties; and that the evidence clearly shows that the agreement was that the defendants would not be liable for commissions except on the amount actually received for hire.

The actual agreement entered into by the parties shows a clear intention to pay commissions only on monthly payment of hire when received and not to be bound by the ordinary rule that when parties have agreed upon terms and executed a contract, the broker's work is done and he has earned his commissions.

The defendants were not guilty of negligence in failing to deliver the vessel on the stipulated date, since it appears that in the ordinary course of sailing it would have been delivered on the date stipulated, but that when the vessel arrived at a French port it was delayed for several weeks in unloading because of the congestion of that port and that when it put in at Gibraltar for bunkering, it was delayed because of a strike on the part of the coal heavers employed to load the bunkers.

APPEAL by the defendants, Yone Suzuki and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 22d day of June, 1925, upon a verdict rendered by direction of the court pur-

suant to a stipulation that the case be tried before the court without a jury and that a verdict be directed with the same force and effect as though a jury were present.

*Hunt, Hill & Betts* [*George C. Sprague* of counsel; *H. Victor Crawford* with him on the brief], for the appellants.

*Smith, Townley & Chambers* [*Frank W. Chambers* of counsel; *Alfred H. Townley* and *Henry Siegrist* with him on the brief], for the respondent.

DOWLING, J. Respondent, a shipbroker, brought this action to recover brokerage commissions as compensation for its services in procuring a charter party of the steamship *Tofuku Maru.* The complaint alleges that the plaintiff, at the request of the defendants, rendered services in procuring the execution of the charter party and did procure the same. It further alleges that the charter party contained the agreement regarding commissions between plaintiff and defendants, and also that plaintiff's services were reasonably worth the sum of £12,148.10 British sterling, being five per cent of the gross amount of the charter which defendants had agreed to pay therefor. The complaint further alleges that the defendants neglected and failed to deliver the vessel prior to November 30, 1919, the cancellation date named in the charter, and that the charterer exercised his option of cancellation and refused to take delivery of the vessel and canceled the charter and that by reason of the premises there is owing to plaintiff £12,148.10, which had been demanded and payment of which had been refused.

The amended answer admits that the plaintiff rendered services in procuring said charter at the request of the defendants; that the charter was procured by the plaintiff and that the copy attached to the complaint is a true copy. It denies that the charter party was an agreement between the plaintiff and the defendants; denies that the plaintiff's services were reasonably worth the sum of £12,148.10; denies that the defendants " neglected and failed to make delivery of the said vessel to the said charterer on or before " the cancellation date, but admits the charterer refused to accept the vessel when tendered to him after the cancellation date; denies that the defendants canceled said charter party without the knowledge or consent of plaintiff, and that any sum is due to the plaintiff. Upon the trial the answer was further amended to deny that the charter party provided that the vessel was to be delivered on or before November 30, 1919. Three separate defenses are set up in the answer. The first is that the plaintiff's services in obtaining the charter party were rendered under a contract which provided that the plaintiff, for its services, should receive a commission of

five per cent on the hire actually paid by the charterer to the defendants under said charter party, and that if said charterer did not pay any hire, plaintiff was to receive nothing for its services; and it alleges that no hire was paid, and that no commissions are due. As a second defense it sets up a custom among shipbrokers in the port of New York to the effect that under charter parties like the one in question commissions were only payable upon hire actually received from the charterer. The third defense sets up the contract referred to in the first separate defense, and in addition states that it was agreed between the parties that in the event of the inability of the defendants for any cause beyond their control to tender the vessel to the charterer before the cancellation date, and the charterer refused to accept delivery, the plaintiff should be entitled to no compensation for its services; that the defendants were unable to tender the vessel to the charterer prior to the cancellation date named in the charter and prior to December 11, 1919, owing to strikes, embargoes and other causes over which they had no control and for which they were not responsible, and that the non-delivery of the vessel to the charterer before December 11, 1919, was not due to the negligence, default or any act of the defendants, and that, therefore, no commissions were due.

The sufficiency of the first and second defenses was heretofore passed upon by this court, which unanimously affirmed, without opinion, an order denying plaintiff's motion to strike out said defenses and for summary judgment. (207 App. Div. 839.)

The evidence shows that the charter party of the *Tofuku Maru* was prepared by the plaintiff and was executed in New York on October 1, 1919. It was a contract between the defendants, agents for owners of the ship, and one O. M. Ellsworth, the charterer.

The usual printed form of the contract of charter, as prepared by plaintiff for use in its brokerage business, contained the following provision as to the payment of brokerage commissions:

" 26. A commission of Five per cent upon the gross amount of this Charter, payable by the Steamship and Owners due to B. W. Lougheed & Company, Ltd., upon the signing ° hereof, Steamship lost or not lost, by whom vessel is to be reported, and also upon any continuation or extension of this Charter or on sale of Vessel."

In the form in which the present charter was signed the words " upon the signing hereof " were stricken out and the words " on monthly payment of hire " were interlined in typewriting above them, so that the brokerage provided by the contract in its final form was five per cent of the gross amount of the charter payable on monthly payments of hire.

As to what occurred when this alteration was first made in

plaintiff's form for use with defendants, there is some dispute. It is agreed, however, that the Japanese steamship in question, the *Tofuku Maru* was the fourth vessel chartered by defendants through plaintiff as broker, and that the first one so chartered was the steamship *Yaye Maru*. The witnesses all agreed that when the charter party on that first vessel was brought to defendants' office, it contained the printed clause providing for a commission of five per cent due upon the signing of the charter party, and that it was altered in the presence of Lougheed, plaintiff's president, by striking out the words " upon the signing hereof " and inserting the words " on monthly payment of hire." In preparing the subsequent charters for the steamers *Taibu Maru, Hiyeizan Maru,* and the charter here involved for the *Tofuku Maru* on the same printed form, the plaintiff voluntarily made a similar alteration in the commission clause before submitting the charters to defendants' representative for approval. The record shows that early in the fall of 1919 Bertram W. Lougheed, president of the plaintiff, and Louis Moed, chartering clerk of the plaintiff, called upon Shunzo Sukeno, the then head of the steamship department of defendants, at their New York office, soliciting business. Lougheed and Moed testified that Sukeno told them that " he would pay us the usual 5% commission." Sukeno testified that he told them he would pay them commissions against actual money received from the charterers, and Lougheed replied: "All right, quite satisfactory."

Thereafter Lougheed and Moed again called upon Sukeno and submitted a draft charter for the *Yaye Maru* containing a commission clause reading: "A commission of Five per cent upon the gross amount of this Charter, payable by the steamship and owners due to B. W. Lougheed & Company, Ltd., upon the signing hereof." Sukeno testified that when this was presented to him he told Lougheed he would not agree to the commission clause as worded, and insisted that it should provide that plaintiff should receive commissions only on actual money received from the charterer, and that Lougheed agreed to this; and the words " on monthly payment of hire " were substituted for the words " upon the signing hereof," to show this agreement. Lougheed and Moed testified that when the draft charter party was given to Sukeno, Sukeno took a pen and began to read the charter party; he started at the very beginning and went through every line of the agreement and made certain corrections in writing, in ink. Lougheed was asked: " What did he do when he came to the commission clause? A. He struck out ' on signing ' and put on ' on monthly payment of hire.' Q. Did he say anything? A. Not a word." And Moed testified: " Q. Did Mr. Sukeno, at the time he made these corrections, say anything

about the language of the. commission clause? A. Not at all."
Lougheed then took back to his office the proposed charter party
with the changes indicated thereon by Sukeno, and had a new
copy typed containing these corrections, which was later executed
by defendants. When the *Taibu Maru, Hiyeizan Maru* and *Tofuku
Maru* were chartered, Sukeno testified his instructions to Lougheed
were to make the charter party for each upon the same form as
the *Yaye Maru*, and to use the same commission clause as amended.
The proposed charter parties for these vessels which were presented
by Lougheed to Sukeno contained the changes in the commission
clause which Sukeno made in the draft charter party. Sukeno
testified that when each of these proposed charter parties, including
that of the *Tofuku Maru*, was brought to him for signature, he
inquired as to whether the commission clause had been changed
from the form in the printed document, and having found that it
had been so changed, remarked to Lougheed that this meant the
plaintiff was only to obtain commissions upon the hire actually
received from the charterer; and that Lougheed said that that was
all right. Lougheed and Moed denied that any conversation took
place about the change in the commission clause, and testified
that nothing was said by anybody.

Weighing the evidence, and particularly upon examination of
the exhibits in the case, it seems to me that defendants have fairly
established that the charter party in the form in which it was signed
was the result of the open and unmistakable announcement of
defendants' representative that they would pay brokerage only
on the monthly payments of hire as they were received, and the
acquiescence of plaintiff's representatives therein, as shown by the
immediate change in the first charter party to meet defendants'
views, and by the use of the same form in the three following con-
tracts negotiated by plaintiff for defendants. While language was
left in the clause in question appropriate to the original form sub-
mitted providing for commissions immediately on signing, in the
words " Steamship lost or not lost," they are not inconsistent with
the idea of commissions only on monthly hiring paid, as under the
16th clause of the charter party, in the event of the loss of the vessel,
money paid in advance and not earned should be returned to the
·charterers at once. The survival of the words " Steamship lost or
not lost " in this contract would insure the brokers their commis-
·sions on monthly hiring paid in advance, even though the defendants
were required to return the unearned part thereof to the charterers.

In the charter party now before us for consideration, the fourth
negotiated by plaintiff for defendants, the words " upon the sign-
·ing hereof " had been deleted, but the words " on the monthly

payment of hire " were typewritten in at the end of the whole
26th clause, thus, it seems to me, making clear that a course of
dealing had already grown up between plaintiff and the defendants,
as the result of defendants' stand that it would pay brokerage on
monthly payments for hire only and plaintiff's acceptance thereof,
so that the typewritten added words at the end of the clause, " on
the monthly payment of hire," qualified all that went before and
made this contract not one to pay commissions on the gross amount
of the charter with payment thereof deferred until the successive
monthly hire was paid, but one to pay brokerage on the amount
of the monthly hire only as and when paid.

Ordinarily, when the parties have agreed upon terms and executed
a contract, the broker's work is done and he has earned his com-
missions. The broker, of course, may by contract vary this rule
to any extent. He may relinquish his right to commissions, and
may agree to a different basis upon which they shall be payable.
The effect of the change in the commission clause was more than
merely to change and defer the date of payment. If such had
bêen the intention, it would have been a simple matter, as the
appellant urges, to add after the words " due   *   *   *   upon the
signing hereof " the words " but payable only upon the monthly
payment of hire." The language used, as I have said, indicates
a clear intention to pay commissions only on the monthly payment
of hire when received. Such an arrangement is not unusual. In
*Colvin* v. *Post Mortgage & Land Co.* (225 N. Y. 510, 517) it was
said: " No collections, no commissions, has a fair business appeal
to both seller and broker." But if the sale fails through a seller's
fault, a very different situation arises.

In *Fuller* v. *Bradley Contracting Co.* (183 App. Div. 6; affd.,
without opinion, 229 N. Y. 605) the court said (at p. 20): " But
no one will dispute the proposition that a broker may make any
legitimate agreement as to his services and payment therefor which
may suit the transaction and accord with the desires of all concerned.
A broker may bind himself not to demand payment unless the
contract is actually carried out. He may, if he sees fit, agree that
he shall have no claim for commissions unless his principal actually
receives the fund from which the broker's compensation is made
payable. Such agreements are lawful and proper and not unusual.
Even in such case, the broker has the right to insist on good faith
on the part of his principal. His right to commissions cannot be
defeated by capricious refusal on the part of the principal to pro-
ceed with the contract, or by fraud or deceit practiced with a view
to relieve the principal from his lawful obligations. The plaintiff
in the present case makes no claim, and certainly the evidence

disproves any suggestion that the defendant and its officers were not willing and anxious to carry out the contract. They did their utmost to secure it." (See, also, *Bliven* v. *Lighthouse*, 231 N. Y. 64; *Condict* v. *Cowdrey*, 139 id. 273; *Booth* v. *New Process Cork Co.*, 196 App. Div. 376; *Hardy & Ruperti, Inc.*, v. *Neuss, Hesslein & Co., Inc.*, 211 id. 697.)

In *White* v. *Turnbull, Martin & Co.* (78 L. T. R. 726; 8 Aspinall M. C. [N. S.] 406; 3 Com. Cas. 183; 14 T. L. R. 401) the charter party provided that the broker was to receive a commission of five per cent on all hire earned. During the currency of the charter party, litigation arose between the defendants and the charterers as to the fitness of the vessel for the work for which it was to be employed, which finally resulted in the cancellation of the charter party by a court decree entered upon consent of both parties. There was no willful act or default on the part of the defendants in bringing about this result. The plaintiff, who received his commission on the hire paid for the two months that the vessel had been employed before cancellation, sued for commissions on the balance of the charter period. The court dismissed the complaint, saying: " I think the intention of both parties was that commission should only be payable upon hire actually earned, and that all risks which might interfere with the earning of hire, short possibly of the defendants' own wilful default, should be shared by them both; that is to say, if from causes such as brought this charter to an end no hire was earned, the plaintiff was to be paid no commission."

In the present case defendants sought to introduce evidence to show how they and the plaintiff had interpreted this same commission clause in the case of the other three charter parties procured for them by plaintiff. The learned court refused to admit the testimony, saying it might be valuable if the contract were ambiguous, but that he thought he understood its terms. Treating the contract as unambiguous, I am of the opinion that commissions were payable to plaintiff only as and when monthly hire for the steamship was received by defendants.

Upon the question as to whether defendants had been guilty of any default by reason of which the steamship was not ready for delivery to the charterer at a United States North Atlantic port by November 30, 1919, the date fixed by the charter party, the record shows without dispute that at the time of the execution of the charter party of the *Tofuku Maru* the vessel was at Marseilles awaiting discharge of cargo. Due to congestion of shipping in that port over which the defendants had no control and for which they were not responsible, the vessel was delayed there. Arriving at Marseilles on the morning of September 15, 1919, she was unable

to discharge her cargo and leave the port until October twenty-eighth, when she sailed for Gibraltar to take on the bunker coal required to bring her to the port of delivery under the charter. Upon arrival of the vessel at Gibraltar it was found that there was a strike among the coal heavers who were ordinarily employed to load the bunkers. This strike was general in Gibraltar and continued until after the vessel sailed. The coal merchant from whom the coal had been ordered in Gibraltar attempted to obtain bunkers for this vessel at a neighboring port but was unable to do so. Consequently her officers and crew bunkered the vessel themselves, which is not customary, and finally, after great efforts, were able to obtain their bunkers and ballast required for the voyage and sailed from Gibraltar on November twenty-fourth for Hampton Roads, where the vessel was to be delivered under the charter party. In the meantime the defendants had requested the charterer to extend the canceling date, in view of the circumstances, but he refused to do so and refused to exercise his option until the vessel was tendered. Notices were sent by defendants to plaintiff stating that the vessel was delayed by strikes and asking it to obtain from the charterer an extension of the cancellation date, but no extension was obtained. The vessel arrived at Hampton Roads on December eleventh, was tendered to the charterer's representative and the charterer thereupon exercised his option and canceled the charter.

The learned trial court found as a fact, in his opinion, that " defendants made every reasonable effort to get the steamer to Hampton Roads by November 30, 1919," and that " defendants' inability to make tender " by that date " was not due to deliberate acts on defendants' part nor to defendants' negligence but was due to conditions over which defendants had no control."

Finding that plaintiff's right to brokerage extended to monthly hire only, as paid to defendants, and that the cancellation of the charter party by reason of the failure of the steamship to arrive by the stipulated time was due to no default or negligence of the defendants, it follows that a verdict should have been directed in favor of the defendants, with costs, as requested in defendants' motion.

The judgment appealed from should, therefore, be reversed, with costs, and judgment granted for defendants, with costs, upon a directed verdict in their favor.

CLARKE, P. J., MERRELL, McAVOY and MARTIN, JJ., concur.

Judgment reversed, with costs, and judgment ordered for defendants upon a directed verdict in their favor, with costs.