**PHS. VAN OMMEREN SHIPPING (U.S. A.), INC. and Phs. van Ommeren (Hamburg), G.M.B.H., Plaintiffs,**

v.

**INTERNATIONAL BANK, Defendant.**

United States District Court
S. D. New York.
July 24, 1961.

Harper & Matthews, New York City, for plaintiffs, Harold Harper, Vincent P. Uihlein, New York City, of counsel.

McLanahan, Merritt & Ingraham, New York City, for defendant, Emanuel Becker, New York City, of counsel.

DIMOCK, District Judge.

Plaintiffs, who are ship brokers, sue for amounts equal to the commissions which they allege would have been payable upon a contract for affreightment of

coal, which was executed, and upon ship charters, which were projected. Defendant is not a party to the coal affreightment contract and would not have been a party to the ship charters. Allied Transportation Corporation, hereinafter "Allied", executed the coal affreightment contract as carrier and would have executed the ship charters as charterer. Liability is sought to be imposed upon defendant based on its arrangements with plaintiff before the incorporation of Allied.

In the fall of 1955, persons who had been in touch with plaintiff Phs. van Ommeren Shipping (U.S.A.) Inc., hereinafter van Ommeren U.S., ship brokers, approached defendant International Bank with respect to a project for the shipment of coal from the United States to Germany, return in ballast to Mexico, shipment of sulphur from Mexico to the United States and repeating the process. Defendant thereupon wrote van Ommeren U.S. a letter dated November 2, 1955, a copy of which is contained in the margin.[1] It is to be noted that defendant stated that it had "in principle accepted a proposal to finance and conduct a shipping business" which "would be operated through a corporation to be formed by us and to which we would supply the financial resources".

On November 9, 1955, plaintiff van Ommeren U.S. replied to defendant's letter of November 2, by a letter a copy of which is contained in the margin.[2] It is to be noted that van Ommeren U.S.A. stated: "We conservatively estimate that it will be possible to timecharter two

[1]
"International Bank
"726 Jackson Place
"Washington 6, D.C.
  "24th Floor
  "261 Madison Avenue
  "New York 16, New York
  "November 2, 1955
"Phs. Van Ommeren Shipping
  (U.S.A.) Inc.
"11 Broadway
"New York, N.Y.
"Att: Mr. J. Solleveld
"Dear Sirs:

  "We have in principle accepted a proposal to finance and conduct a shipping business which includes time chartering two Liberty dry cargo type ships to carry cargo generally between Mexico, the United States and certain foreign countries.

  "The business would be operated through a corporation to be formed by us and to which we would supply the financial resources.

  "We advise you of the foregoing so that the initiation of contracts may be expedited pending prompt formalization of the necessary corporate and financial arrangements.

  "We are happy to refer you to our New York correspondents which include Grace National Bank of New York, Chemical Corn Exchange Bank and Empire Trust Company.
            "Yours very truly,
        "(signed) T. Reed Vreeland
              "T. Reed Vreeland
                "President"

[2]                     "November 9, 1955
  "International Bank
  "24th Floor
  "261 Madison Avenue
  "New York 16, New York
  "Attention: Mr. T. Reed Vreeland,
                    President
"Gentlemen:
"We would like to refer to your letter dated November 2, 1955, and are happy to advise that we have since completed our coverage of the freight markets. All the necessary sources were approached through the conventional channels and we are now in a position to give you the following advices.
"We conservatively estimate that it will be possible to timecharter two dry cargo liberty type vessels for 5 year periods commencing early 1956 at a rate of hire not exceeding $2.90 per ton dead weight per month.
"Furthermore, we expect to be able to negotiate contracts for coal cargoes from U. S. North Atlantic ports to the Continent for a period commencing with the first availability of the vessels referred to above through March 1960 with a possibility that cargoes covering the period from April 1960 until the scheduled redelivery of the vessels by the beginning of 1961 might be included.
"As regards freight rates for those coal cargoes, at this time a contract covering shipments through 1956 or early 1957 is obtainable at from 57/– to 58/– basis Antwerp/Rotterdam/Amsterdam discharge. We are also in the proc-

dry cargo liberty type vessels for 5 year periods commencing early 1956 at a rate of hire not exceeding $2.90 per ton dead weight per month". The letter added that van Ommeren U.S. expected to be able to negotiate contracts for coal cargoes and gave information with respect to rates. The letter suggested that formal authorization be extended to van Ommeren U.S. to negotiate and finalize charters in accordance with the information given.

On November 16, 1955, representatives of defendant for the first time met with representatives of van Ommeren U.S. At this meeting van Ommeren U.S. stated that the amount of money that would be necessary for the project would be 2½ months operating expenses, which it was estimated would be between $100,000 and $150,000 with $150,000 as a maximum. Defendant's representatives made it plain that defendant would not sign or guarantee a coal contract or a time charter. All parties contemplated that a foreign corporation would execute the coal contract as carrier and the ship charters as charterer. There was discussion of the basis and rate of plaintiff's commission. At the trial it was testified without contradiction that the customary broker's commission on a coal affreightment contract was 1¼% and on ship charters 1¼%.

On November 18, 1955, Allied Transportation Corporation was formed by defendant.

As a result of the efforts of plaintiffs, a coal affreightment contract for Fisser & v. Doornum of Hamburg, hereinafter Fisser, was obtained for the newly incorporated Allied. It provided that a certain commission was due by Allied to Fisser "on shipment of cargo * * * in addition to ¾ per cent to Phs. van Ommeren (Hamburg) G.M.B.H. and 1¼% per cent to Phs. van Ommeren Shipping (U.S.A.) Inc." Phs. van Ommeren (Hamburg) G.M.B.H. is one of the plaintiffs in this case.

Van Ommeren U.S. made diligent efforts to get ship charters for the purpose of carrying the coal but, before any charter which met the stipulations of Allied was offered, defendant announced that it would not go through with the ship deal. The coal affreightment contract was never carried out and no ship charters were executed.

Fisser brought an action against defendant to compel defendant to arbitrate a claim under the coal affreightment contract. The theory of the action was that Allied, a party to the contract, was defendant's alter ego. Defendant had judgment below and it was affirmed on appeal. Fisser v. International Bank, 2 Cir., 282 F.2d 231.

There is no reason in law why defendant could not have made a contract with plaintiffs under which defendant hired plaintiffs to obtain a coal contract and ships for a yet unformed corporation and agreed to pay the commissions for ob-

---

ess of closely working another contract commencing early 1957 through March 1960 or possibly later for which a rate of from 43/- to 44/- is probably obtainable, also on the basis of Antwerp/Rotterdam/Amsterdam discharge, with the usual rate differentials for discharge at German North Sea ports.
"We have pleasure in attaching hereto, for your further guidance, one photostatic copy each of typical examples of a time charter and a coal charter. It goes without saying that there may be some changes in the terms and conditions of these contracts depending upon the outcome of the negotiations to be conducted.

"It is suggested that formal authorization be extended to us now to negotiate and finalize the charters in accordance with the foregoing.
"We would like to assure you at this time that we shall be most pleased to protect your interests in all respects in connection with this business. Any further information which you might require is, of course, available to you.
"Thanking you, we remain,
"Very truly yours,
"PHS. VAN OMMEREN
SHIPPING (U.S.A.) INC.,
"JAV/jm                    J. A. Vincent
"Encl.                     Vice President"

taining the contract and ships. The difficulty is that there is no evidence of such a contract. There is no claim that there was ever an express agreement that defendant would pay commissions. We are asked to infer it from the circumstances. The circumstances, however, point the other way. Since defendant expressly declined to assume liability for the contract of affreightment or the ship hire, the natural inference would be that it was not agreeing to pay brokers' commissions for obtaining the contract and the ships. Both sides agree that the normal and usual commission for a shipbroker who obtains an affreightment contract or a ship is 1¼% of the gross freight or gross time charter hire. There was uncontradicted testimony that it was customary for the shipowner or disponent owner to collect the commission out of the freight when earned under a contract of affreightment. Indeed it was so provided in the affreightment contract which was here executed. While there was no testimony of a custom as to who should pay a shipbroker's commission for obtaining a ship, the government form of time charter, approved by the New York Produce Exchange, supplied by van Ommeren U.S. to defendant as "a typical example", provided that the shipowner should pay a commission "on hire earned and paid" under the charter. The natural inference is that the commission payable for obtaining the ship should be a commission "on hire earned and paid" and consequently that the person paying the hire so earned and not some outsider should be the person to pay the commissions. This inference that the person paying the hire should pay the commission accords with the inference to the same effect arising from defendant's refusal to accept any liability under the affreightment contract or the charter parties.

Plaintiff, however, points to the letter of November 2 in which defendant notified plaintiff that defendant had "in principle accepted a proposal to finance and conduct a shipping business" which "would be operated through a corporation to be formed through us and to which we would supply the financial resources".

Doubtless, if defendant had offered to supply to the corporation to be formed sufficient financial support to enable it to perform the contract of affreightment and to enable it to obtain the necessary ships and if plaintiff, acting in reliance on that offer while it was still outstanding, had obtained the contract of affreightment and had obtained shipowners ready, able and willing to supply ships on terms stipulated by Allied and if defendant had then withdrawn its offer to supply the necessary finances and thus robbed plaintiff of its commissions, plaintiff would have been entitled to recover from defendant an amount equal thereto.

Here, however, the offer was withdrawn before van Ommeren U.S. had ever produced a shipowner ready, willing and able to meet terms stipulated by Allied.

■ By the statements in the letter of November 2 defendant, at most, assured van Ommeren U.S. that, if plaintiffs closed a contract and a charter party for the corporation to be formed, the corporation would have sufficient financing to enable it to carry out the contract and charter party or at least pay any commissions earned. Defendant's offer to the broker to supply financing was no more irrevocable than is the ordinary offer to a broker to pay him a commission if he brings the principal and a third party together on a deal. A principal may, without liability, withdraw his broker's authority at any time before the broker produces. Auerbach v. Internationale W. Lampen A. Gesellschaft, C.C.S.D.N.Y., 177 F. 458.

■ Before the broker brought Allied and any third party together on the terms of a charter party defendant did withdraw its offer to finance the corporation to be formed so that defendant is under no liability for commissions that

plaintiff might have earned for obtaining ships.

■ Is defendant, however, liable for commissions that plaintiff was not paid for obtaining the contract of affreightment that actually was obtained?

Any right of the brokers to recover damages from defendant was, in the nature of things, contingent on the brokers' procuring ships. On the theory that we are considering now, the theory that defendant kept the brokers from earning commissions by failing to finance the operation, the brokers must show that they would have earned the commissions except for some default of defendant. Under the terms of the contract of affreightment the brokers would have earned commissions when the cargo was shipped.[3] The cargo could not have been shipped, however, without ships. The brokers' reply that ships would have been available if defendant had not failed to finance the operation avails them nothing since defendant was wholly within its rights in withdrawing any offer to finance so long as the brokers had not yet produced a shipowner ready, willing and able to execute a charter party on terms satisfactory to Allied.

All claims of plaintiffs are dismissed.

This opinion is intended to embody findings of fact and conclusions of law. If any additional are desired they may be submitted in proposed form.

■ No costs will be allowed defendant. Its victory has been won by an application of the doctrine that under a unilateral contract the offeror is not bound until the offeree has completed performance. While the result of that doctrine here is not so harsh as in cases such as Petterson v. Pattberg, 248 N.Y. 86, 161 N.E. 428, I do not wish to add any harshness by way of imposition of costs.

3. See French & Co., Ltd. v. Leeston Shipping Co., Ltd., House of Lords, [1922] 1 A.C. 451; Lougheed & Co., Ltd. v.

Suzuki, 1st Dept., 216 App.Div. 487, 215 N.Y.S. 505, affirmed without opinion 243 N.Y. 648, 154 N.E. 642.