TANKERS INTERNATIONAL NAVIGATION CORPORATION, Respondent-Appellant, v NATIONAL SHIPPING & TRADING CORP. et al., Appellants-Respondents, et al., Defendants.

First Department, March 11, 1986

## APPEARANCES OF COUNSEL

*Owen McGivern* of counsel *(Beth A. Finley* and *Beth Glassman* with him on the brief; *Donovan Leisure Newton & Irvine,* attorneys), for appellants-respondents.

*Peter M. Bellsey* of counsel *(Stuart M. Fischman* with him on the brief; *Dunn & Zuckerman, P. C.,* attorneys), for respondent-appellant.

## OPINION OF THE COURT

SULLIVAN, J.

Plaintiff, a ship-chartering broker, has brought this action against five shipowners and their agent, National Shipping & Trading Corp. (National), for commissions allegedly earned pursuant to charter parties it arranged from 1971 to 1973 between each of the shipowners and the national oil company of the government of Indonesia, P.M. Pertambangan Minjak Dan Gas Bumi National (Pertamina), not a party hereto. John Theodoracopulos is the president of all of the corporate shipowners, which are interrelated. Each of the charter parties required the particular shipowner to arrange for the construction and delivery of an ocean-going oil tanker for exclusive charter by Pertamina.

Three of the shipowners built vessels which were used by Pertamina from the time of delivery in 1973 and 1974 until late 1975, when, concededly, it defaulted under the charter parties. As a result of the default, the other two shipowners, which were to build a vessel, "To Be Named", for delivery sometime between September 1, 1976 and December 31, 1978, canceled the construction contracts for these vessels.

Each of the charter parties was for a 10-year term with ownership of the subject vessel to be transferred to Pertamina at the conclusion thereof. The charter parties expressly provided that plaintiff was entitled to a 2½% commission "on all hire as paid [thereunder]." There were no other writings memorializing the brokerage agreement. The parties agree that hire in the amount specified in the charter party was to

be paid monthly, in advance, to plaintiff, which would then deduct its 2½% commission and remit the balance to the appropriate shipowner through National. After delivery, Pertamina put the three newly constructed tankers, the *Monemvasia, Mesologi* and *Mantinia*, into service and paid hire in excess of $20,000,000 until August or September 1975 when, without notice and as a result of circumstances beyond the shipowners' control, it terminated the payments.

The shipowners subsequently learned that the Indonesian government was experiencing serious financial problems and that a major restructuring of the national debt was under way. After discussions with Pertamina's executives, when it became apparent that they would never collect the $309,387,038.80 in hire due them over the balance of the charter parties' 10-year terms, the shipowners moved to protect their rights. Thus, in early December 1975, at approximately the same time as Pertamina ordered that the *Monemvasia, Mesologi* and *Mantinia* be placed in lay up,[1] their respective owners commenced an action against it in Federal court in both New York and California, alleging a failure to pay charter hire and other amounts due and owing. They also served a demand for arbitration. Eventually, after Pertamina threatened to invoke sovereign immunity, the successful assertion of which would have barred any recovery, the five shipowners, pursuant to three agreements executed over a 13-month period, agreed to a $55,000,000 settlement.

The first two settlement agreements, executed in January and April of 1976, provided for payments of $6,000,000 and $7,000,000, respectively, for "charter hire" for a period during which the shipowners promised to refrain from taking any further legal action to vindicate their rights under the charter parties.[2] The balance of the settlement amount, $42,000,000, was paid pursuant to a "Release and Cancellation Agreement", entered into on February 17, 1977, which, unlike the earlier agreements, finally disposed of the parties' dispute, expressly providing that the shipowners' cancellation of the charter parties was the consideration for the $42,000,000 payment. The shipowners further agreed to waive all past,

---

1. While Pertamina was entitled to certain credits when the vessels were placed in lay up, it was not relieved of its obligation to pay hire. The $309,387,038.80 balance due the shipowners takes into account these credits.

2. The owners of the two "To Be Named" vessels, although parties to the second and third settlement agreements, were not parties to the $6,000,000 January 1976 agreement.

present and future claims of any nature, including, but not limited to, unpaid charter hire and operating expenses. The $55,000,000 was allocated among the three shipowners whose vessels had been delivered.

Plaintiff thereafter, on April 22, 1977, invoiced the shipowner defendants for 2½% of the settlement payments. National responded in their behalf, writing in pertinent part, "The payment referred to in your letter, in amounts lesser than the charter hire payable under subject Charters, are not in payment of charter hire but rather in settlement of the Owners' claims against Charterer for breach of the Charters which, as you are aware, was the subject of litigation and arbitration." Plaintiff commenced this action some five years later, in May 1982, after its attempts to collect commissions on the settlement proceeds proved unsuccessful. After issue was joined and discovery conducted it moved for summary judgment.

Characterizing the settlement proceeds as, "in actuality, a substitution for the payments due under the charters", Special Term granted partial summary judgment and allowed plaintiff a recovery of brokerage commissions on all but $7,000,000 of the settlement payments. As to plaintiff's claim to commissions on the first $7,000,000, which were paid more than six years prior to the commencement of the action, Special Term granted defendants' motion to amend their answer to interpose a Statute of Limitations defense. Since we believe that the shipowners' obligation to pay brokerage commissions on the settlement proceeds cannot be resolved as a matter of law, we find that summary judgment should have been denied in its entirety.

The general rule with respect to brokerage commissions is that, in the absence of a special contract, the broker is entitled to a commission when he brings his principal and a third party together and their minds meet on the essential terms of an agreement. *(Kaelin v Warner,* 27 NY2d 352, 355-356; *Galbreath-Ruffin Corp. v 40th & 3rd Corp.,* 19 NY2d 354; *Williamson, Picket, Gross v Hirschfeld,* 92 AD2d 289, 293.) Where a special contract exists, the broker's entitlement to commissions is entirely dependent upon the language of the contract authorizing those commissions. *(Lougheed & Co. v Suzuki,* 216 App Div 487, 492, *affd* 243 NY 648; *Caldwell Co. v Connecticut Mills Co.,* 225 App Div 270, 273, *affd* 251 NY 565; *Fuller v Bradley Contr. Co.,* 183 App Div 6, 26-27, *affd* 229 NY 605.) The rule is the same with regard to brokerage commis-

sions due on the negotiation of a charter party. *(See,* Poor, Charter Parties and Ocean Bills of Lading § 34, at 89 [5th ed].) Here, the provision authorizing the payment of brokerage commissions specifically states that commissions are due "on all hire as paid under th[e] charter[s]." Thus, plaintiff's right to commissions under each of the charter parties accrued only to the extent that hire was actually paid.

In *Lougheed (supra),* this court held that a ship-chartering broker was not entitled to recover a commission on the gross amount of the charter under a charter party that had been canceled due to the failure of the defendant shipowner to make a timely delivery of the vessel to the charterer. The charter party provided that a commission was due "on the monthly payment of hire." The inclusion of such a clause, said the court, "indicate[d] a clear intention to pay commissions only on the monthly payment of hire when received" (216 App Div, at p 492) and thus, specifically limited the broker's right to recovery. "Treating the contract as unambiguous", the court found that "commissions were payable to plaintiff only as and when monthly hire for the steamship was received by defendants" *(supra,* at p 493).

In support of its holding, the *Lougheed* court cited *White v Turnbull, Martin & Co.* (78 LT Rep 726). There, the court denied a recovery to a broker on a canceled charter party which provided that the broker was to receive a commission of 5% on all hire earned. Litigation between the vessel owners and the charterers as to the fitness of the vessel had been terminated by the entry of a consent decree canceling the charter party. There was no willful act or default on the part of the vessel owners in bringing about this result. The broker, who received his commission on the hire paid for the two months that the vessel had been employed before cancellation, sued for commissions on the balance of the charter period. In dismissing the complaint, the court stated: "I think the intention of both parties was that commission should only be payable upon hire actually earned, and that all risks which might interfere with the earning of hire, short possibly of the [vessel owners'] own wilful default, should be shared by them both; that is to say, if from causes such as brought this charter to an end no hire was earned, the [broker] was to be paid no commission" *(supra,* at p 727).

In this case, plaintiff argues that its right to commissions attaches to the settlement funds since they represent the payment of hire exclusively. The shipowners make the point

that the payment of commissions was dependent upon the charterer's meeting its monthly obligation to pay hire. The only writings on the subject are the charter parties, which merely provide for the payment of a 2½% brokerage commission by the shipowners to plaintiff on all hire, and a written confirmation of plaintiff's right to withhold its commission from the monthly hire payment. Furthermore, the record is barren of any evidence of any custom or usage in the industry with respect to the payment of brokerage commissions. Thus, in the absence of a writing or trade custom clearly delineating the conditions to the payment of commissions, each party has freely asserted its own interpretation of the brokerage agreement. Unlike in *Lougheed (supra)*, the charter parties did not expressly provide that commissions were due on the monthly payment of hire so that the analysis which led the court there to conclude that the broker was entitled to commissions only on the monthly hire payments as received is not mandated here as a matter of law. Moreover, the ultimate determination there was made on a record after trial which included testimony as to the circumstances attending the drafting of the brokerage commission clause. Thus, in our view, a factual question is presented as to whether the obligation to pay commissions survived Pertamina's default under the charter parties.

While it is undoubtedly beyond dispute, as plaintiff argues, that the $55,000,000 settlement represents a compromise of the shipowners' claim for $309,387,038.80 in hire due under the five charter parties over the balance of their 10-year terms, that circumstance does not, ipso facto, foreclose further inquiry. Even had the shipowners recovered the full amount of hire sought by their claims, it is well settled that a broker is not entitled to recover commissions merely because his principal has secured a benefit equivalent to what he would have received had the contract been performed. *(Caldwell Co. v Connecticut Mills Co.,* 225 App Div, at pp 273, 278; *Segal Brokerage Co. v Lloyd L. Hughes, Inc.,* 96 F2d 208, 210; *Rountree Co. v Dampskibs Aktieselskabet Oy II,* 1934 Am Mar Cas 26 [City Ct of City of NY 1933].)

In any event, an equivalent performance argument is incompatible with the facts of this case. In accepting this argument, Special Term assumed that the shipowners received a windfall from the settlement since they were able to engage the three chartered tankers, which had been returned to them, at an additional profit. One of them, however, the

*Mantinia,* was sold in 1977 under adverse conditions, and while the other two are now employed fairly continuously, they are engaged on short-term charters, and not always profitably.[3] Two of the shipowners, at, it should be noted, a cost to future business, had to cancel contracts for the construction of their vessels. Thus, it is readily apparent that the shipowners sustained heavy losses, having recouped a mere $55,000,000 rather than the $309,387,038.80 they would have received had the charter parties been fully performed.

While plaintiff stresses the significance of the words "part payment of charter hire" in some of the settlement documents, this phrase is conspicuously absent from the February 17, 1977 release and cancellation agreement finally disposing of the shipowners' claims. Moreover, the three settlement agreements should be construed "in the context of the whole agreement." *(Zodiac Enters. v American Broadcasting Cos.,* 81 AD2d 337, 339, *affd* 56 NY2d 738.) "Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *(Atwater & Co. v Panama R. R. Co.,* 246 NY 519, 524.) Fairly construed, the three agreements purport to settle the Federal litigation and the shipowners' claims, including, but not limited to, those for unpaid charter hire, arising out of Pertamina's default under the charter parties.

Nor should we blind ourselves to the reality of the underlying transactions. What purported to be a tanker time charter party for a period of 120 consecutive months was, in reality, a purchase agreement calling for the construction of a tanker, with payment to be spread over a period of 10 years and tendered in the form of hire. As the deposition testimony shows, the shipowners financed the construction of the three tankers eventually delivered by bank loans, the repayment of which was seriously jeopardized by Pertamina's default. Quite obviously, a breach of a purchase agreement payable over 10 years encompasses damages that cannot be measured by the mere loss of installment payments, especially where the seller, in the expectancy that the buyer will honor its commitments, has borrowed to meet its obligations under the agreement. As already indicated, the return of the tankers and the concomi-

---

3. In accordance with *Matter of City of New York (James St.)* (21 NY2d 293, 301), we take judicial notice of the depression in the world tanker market since 1974.

tant opportunity to recharter them did not necessarily offset those damages. Thus, it appears that the shipowners have not, even *pro tanto,* received the equivalent of what they would have realized but for the failure of performance by Pertamina.

In support of its claim to commissions on the settlement proceeds, plaintiff relies primarily upon *Kane v Neptune Shipping* (274 App Div 28), decided by this court subsequent to both *Caldwell* and *Lougheed (supra).* There, a ship broker's assignee had sought a commission on "the hire to be earned" on a time-charter of a tanker under a charter party known as the Oslo charter, which the broker had arranged. Due to numerous defaults by the original charterer, the parties canceled the Oslo charter and, in good faith but without the knowledge or consent of the broker, substituted a subcharter, the Houston charter, in its place and stead. The original charterer, which had procured the Houston charter without the broker's assistance, guaranteed performance by the subcharterer. Although provision was made in the Oslo charter for the payment of brokerage commission on the hire to be earned, the Houston charter did not contain a similar provision. In holding that the broker was entitled to full commissions the court found that the shipowner "accepted a substituted performance that continued the liability of the original charterer and gave the [shipowner] all of the benefits it could possibly have received under the Oslo charter" *(supra,* at p 34).

*Kane (supra)* is distinguishable on both of the grounds upon which it was based. There, unlike here, the court found that the shipowner could not have sustained any implied or constructive losses. Indeed, it found that the shipowner had "received more than it bargained for" *(supra,* p 34). Moreover, the court found that even if the purported cancellation of the Oslo charter and assignment of the Houston subcharter were considered as a mere modification of the original charter and not a cancellation, the broker was entitled to a recovery nonetheless on the theory "that performance under a modified agreement is not such a failure of performance as to cause the broker to forfeit his commissions" *(supra,* p 34). Here, the cancellation of the charter parties is undisputed, as is the fact that there was no substitute performance of the charter parties by any other charterer after Pertamina defaulted and placed the tankers in lay up. Thus, *Kane* does not support plaintiff's position.

Special Term also erred in holding National jointly and

severally liable with the shipowners. On this record, it is fairly obvious that it was merely an intermediary performing only ministerial functions. It was not a party to any of the charter parties or to any of the three settlement agreements. Without some factual basis, National cannot be held liable for commissions allegedly due solely by virtue of contracts to which it was not a party. *(See generally, Blitman Constr. Corp. v Kent Vil. Hous. Co.,* 91 AD2d 173.) Since, however, the complaint alleges that National and the five corporate ship-owners are the alter egos of John Theodoracopulos, and there is at least some evidence suggesting that this may be the case, the matter is best left for trial. In this regard, we also take passing note of the lack of support in the record for the imposition of joint liability upon the shipowners, as reflected in the judgment entered upon the grant of partial summary judgment.

Finally, on plaintiff's cross appeal from the grant of leave to amend the answer, we find that Special Term properly granted the motion. Leave to amend should be freely given (CPLR 3025 [b]; *McCaskey, Davies & Assoc. v New York City Health & Hosps. Corp.,* 59 NY2d 755, 757; *Fahey v County of Ontario,* 44 NY2d 934, 935; *Leslie v Hymes,* 60 AD2d 564) and plaintiff is unable to demonstrate any prejudice.

Accordingly, the order of the Supreme Court, New York County (Alfred M. Ascione, J.), entered December 26, 1984, which, *inter alia,* granted partial summary judgment to plaintiff, should be modified, on the law, to deny plaintiff's motion for summary judgment in its entirety, and, except as thus modified, affirmed; the judgment of the same court and Justice, entered January 18, 1985, should be reversed, on the law, and the judgment vacated, with costs and disbursements to defendants.

SANDLER, J. P., ROSS, KASSAL and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered on December 26, 1984, unanimously modified, on the law, to deny plaintiff's motion for summary judgment in its entirety, and, except as thus modified, affirmed, and a judgment of said court, entered thereon on January 18, 1985, unanimously reversed, on the law, and the judgment vacated. Defendants-appellants-respondents shall recover of plaintiff-respondent-appellant one bill of $75 costs and disbursements of this appeal and cross appeal.