Alexander Webster and Adolph Weiss, Plaintiffs-Appellees, v. Paul P. Hochberg, Ann Hochberg, and Philip Karlin Realty, Inc., an Illinois Corporation, Also Sometimes Referred to as Karlin Realty, Inc., Defendants, Paul P. Hochberg and Ann Hochberg, Defendants-Appellants.

Gen. No. 52,780.

First District.

February 10, 1969.

Ordower & Ordower, Robert A. Sprecher and Edward W. Barrett, of Chicago, for appellants.

Irvin J. Jacobson, Cecil E. Magid, and Grossman, Kasakoff, Magid & Silverman, of Chicago, for appellees.

STOUDER, P. J.

Plaintiffs-Appellees, commenced this action in the Circuit Court of Cook County seeking the rescission of a contract by which they had agreed to purchase real estate and a nursing home business operated thereon, owned and operated by the Defendants-Appellants, Paul Hochberg and Ann Hochberg. The defendants filed their answer denying the allegations of the complaint and in addition filed a counterclaim against the plaintiffs for breach of contract. Philip Karlin, the broker in the transaction filed a counterclaim against the defendants seeking to collect a real estate commission which counterclaim was

denied by the defendants in a separate answer. The cause was referred to a Master in Chancery, who, after hearing extensive evidence, filed his Master's report recommending that the complaint for rescission and the counterclaim for breach of contract be dismissed and further recommended that the $5,000 earnest money down payment paid to the real estate broker by the plaintiffs be forfeited and retained by the real estate broker as his commission. Objections to the Master's report were filed by plaintiffs and sustained by the trial court. Thereupon the trial court decreed that the contract was rescinded and that the plaintiffs were entitled to recover $5,000 earnest money payment. Further, the trial court denied the counterclaim of defendants for damages for breach of contract and also entered judgment in favor of the real estate broker and against the defendants for $13,000, the amount of the real estate commission. Defendants have appealed these actions of the trial court.

Prior to July 11, 1962, the defendants Paul and Ann Hochberg, owned the premises known as 1936 West Belmont Avenue, Chicago, Illinois, which premises were improved with a building used as a nursing home. The defendants owned all the shares of stock in the Belmont Rest Home, Inc., which operated the nursing home under a license duly issued by the Board of Health of the City of Chicago.

On July 11, 1962, the plaintiffs entered into a written contract with the defendants for the sale of the Belmont street property for a total consideration of $261,000. By an attachment to the contract the plaintiffs also agreed to purchase the defendants' shares of stock in the Belmont Rest Home, Inc. for a consideration of $10,000. At the time of the execution of the contract, the plaintiffs paid Philip Karlin, the real estate broker in the transaction, $5,000 as an earnest money down payment, the contract of purchase further providing that the transfer would be completed on July 31, 1962, at which time the

468

plaintiffs were required to make an additional payment with the balance to be payable in deferred installments. On July 31, 1962, the date set for the closing, plaintiffs notified defendants that they were rescinding the contract on account of the fraud of defendants and the failure of defendants to permit the plaintiffs to examine the books and records of the Belmont Rest Home, Inc. The defendants refused to return or authorize the return of the plaintiffs' $5,000 earnest money down payment and these proceedings resulted.

In their complaint plaintiffs allege that they are entitled to rescind the contract because of the fraud of defendants and the failure of the defendants to permit them to examine the books and records. These allegations were denied by defendants and in their counterclaim they sought incidental damages for breach of contract, the damages sought being attorney's fees, title costs and broker's commission in the event they were found liable to pay such commission. The real estate broker's counterclaim alleged that he was entitled to a broker's commission because he was the procuring cause of the sale and that he was entitled to such commission regardless of the outcome of the litigation between the plaintiffs and defendants.

Defendants first argue that the trial court erred in reversing the recommendations of the Master in holding that they were guilty of fraud and allowing plaintiffs to rescind their purchase contract.

The charge of fraud is based on the additional agreement relating to the purchase of the shares of stock of the Belmont Rest Home, Inc. Although such agreement is referred to as a "Rider" both parties concede that the rider and agreement for purchase of land are a single contract.

The complaint alleges that the representations contained in paragraphs 1 and 2 of the rider were false and fraudulent. They provided:

469

"1. Sellers represent and warrant to the Purchaser:

"(a) The corporation has been duly incorporated and is in good standing under the laws of the State of Illinois and is authorized to operate the nursing home now located in Chicago, Illinois.

"(b) The corporation possesses all licenses, permits, authorizations and orders required for the operation of a nursing home under the 'Nursing Homes, Sheltered Care Homes and Homes for the Aged Act' of the State of Illinois, and all requirements of any and all governmental agencies having jurisdiction over nursing homes and the property upon which the same is located.

"(c) That the corporation has complied, and is in compliance with the act and with all rules and regulations issued thereunder and that there are no pending lawsuits or notices relating to fire, zoning, building or health code violations re the premises in question and the operation of the business in the within premises.

"(d) That the nursing home complies in all respects with the act and the rules and regulations issued thereunder.

"(e) . . .

"(f) That the nursing home has been certified and licensed to have bed capacity of no less than fifty-five (55) beds, . . . .

"(g) . . .

"(h) There is no pending legal, equitable or administrative proceeding to which the Corporation is a party or in which it is involved and that no such proceeding has been threatened or contemplated.

"(i) . . .

"2. On the closing date, Seller shall affirm as of said closing date, each of the aforesaid representations and warranties. The representations, warranties and undertakings herein shall remain in full force and effect regardless of any investigation made by Purchaser, . . . ."

The evidence presented to the Master on this issue consisted of the testimony of Ellen Cleary, an inspector for the Chicago Board of Health and Paul Hochberg one of the defendants, together with exhibits from the records of the Chicago Board of Health.

The Municipal Code of the City of Chicago and the rules and regulations of the Board of Health under which the Belmont Rest Home was licensed and operated, provide a regulatory system for the conduct of various types of nursing homes within the City of Chicago. Minimum standards are imposed dependent upon the services and facilities offered. Penalties for violation of the minimum standards have been established. Periodic inspection by personnel of the Board of Health are made to assure compliance with the Code and rules and regulations.

According to Ellen Cleary, an inspector for the Board of Health, a written report is prepared after each periodic inspection, a copy being left with the nursing home operator, and such reports become part of the records of the Board of Health. If any violations of the rules and regulations are found to exist, the operator of the nursing home may be afforded an opportunity to abate such violations.

Ellen Cleary identified Board of Health reports of inspection for the period February, 1962 through July, 1962. These reports, seven in number, were admitted as exhibits for the plaintiffs. The first report dated February 5, 1962, notes under the Summary of Home Inspection, two violations. First, lack of LPN (licensed practical nurse) on night tour and second, although home licensed for fifty-five beds the number thereof had been voluntarily reduced to fifty-one. The reports of inspection for the dates of February 23, 1962, March 26, 1962 and May 31, 1962, either do not indicate any violations (report of March 26, 1962) or violations not material to this proceeding. The next report of June 12, 1962, notes

as a violation, the failure to have an LPN on the night tour and indicates that the violations of May 31, 1962, were abated. Violations noted on the report of July 18, 1962, are that there was no LPN either on afternoon tour or night tour as well as other violations not material to this proceeding. The report also indicates a visit was to be made by Dr. Starcevich and an inspector. The report of July 25, 1962, does not appear to be a regular inspection report but refers to a revisit of the home by Dr. Starcevich and an inspector from the Board of Health. This report indicated that the violations observed on July 18, 1962, were in the process of correction and indicated that discussion took place concerning signing and dating labels on medicine bottles, physical examination admission records and capacity of the home, "permission granted to remain at 49 for 10 days at which time a decision must be made regarding licensure—personnel adequate for census of 49." On the bottom of the report there is a notation of a telephone call received from Dr. Hochberg indicating that he has required personnel for a census of fifty-five and wishes to remain at fifty-five. Each of the reports indicated the number of patients residing on the premises (ranging from forty-nine to fifty) and most of the reports list the capacity of the home at fifty-one (apparently referring to the number of beds standing).

According to the testimony of Ellen Cleary, a nursing home with a licensed capacity of fifty to ninety-nine residents is required to employ a registered nurse 40 hours per week and to employ licensed practical nurses on the afternoon and night tours at all times. If the license capacity is forty-nine residents or less the nursing home is required to employ a licensed practical nurse 40 hours per week.

■ In support of their argument that the evidence supports the Master's conclusion that rescission was not warranted on account of fraud, defendants have called our attention to Bennett v. Hodges, 374 Ill 326, 29 NE2d

524, Krankowski v. Knapp, 268 Ill 183, 108 NE 1006 and Prout v. Hoy Oil Co., 263 Ill 54, 105 NE 26. Such cases involve oral representations allegedly made for the purpose of inducing the execution of a document and hence they are not referred to as being decisive of the issues involved herein. Such cases do set forth the well established elements of fraud which we do not believe require repetition herein. So far as pertinent to our decision in this case, the parties agree that fraud includes the requirement that a representation must be both false and material.

Defendants insist that the representations in the contract were not untrue in any material respect, that the Master's conclusions to such effect are supported by the evidence and the trial court erred in holding to the contrary.

In examining the report of the Master it appears that he considered the violations noted in the Board of Health reports as minor and therefore immaterial. Such view may well have affected his determination that the representations were true.

In our view the conclusions of the Master were not supported by the evidence and we are satisfied that the trial court did not err in rescinding the contract on account of fraud.

 The Board of Health reports as heretofore described in some detail, constitute the principal evidence of false representations. The gist of plaintiffs' claim is that the nursing home did not comply with applicable rules and regulations of the Board of Health because of inadequate personnel. Each of the Board of Health records of June 12, July 18 and July 25, reveal violations because of inadequate personnel namely lack of licensed practical nurses. Such failure jeopardized the continued operation of the nursing home at its licensed capacity of fifty-five residents. As revealed by the report of July 25 and as admitted by Hochberg, the nursing home was

given ten days to indicate its intention to remain at the fifty-five resident capacity, clearly inferring that if no change took place in the prevailing conditions the capacity of the home would be reduced. We regard the adequacy of personnel as an important and material fact in determining whether the nursing home is in compliance with the Act.

That the nursing home did not have adequate personnel on June 12, July 18 and July 25 and that Hochberg had notice of such violations is undisputed by the evidence. In holding as the Master did that on July 11 (the date of the contract) and July 31 (the date of the closing), the nursing home was in compliance with the rules, it appears that the Master relied principally on the testimony of Hochberg to the effect that on such dates there were no pending notices of violations and that the home complied with the applicable rules and regulations on those dates. With respect to his testimony concerning absence of pending notices of violations the records of the Board of Health are to the contrary. According to their reports the violation of June 12 was still pending on July 11. Also according to their records the notices of violations of July 18 and July 25 were still pending on July 31. Although Hochberg offered some testimony to the effect that the violations had been abated in part, it is clear that the notices were still pending on the dates referred to. Likewise his statement that the nursing home complied with the rules on July 11 and July 31 is contrary to the undisputed inferences which may be drawn from the reports. Although adequacy of personnel was the principal issue in the case, Hochberg did not testify that on either of said dates the nursing home employed adequate personnel. Not even the statement on the report of July 25 to the effect that Hochberg had called the Board of Health and indicated that he had adequate personnel and desired to continue at a capacity of fifty-five residents supports this contention. Hochberg when called as an ad-

verse witness under section 60, testified that he did not recall when such telephone call was made and could not recall whether it was made before or after the contract was rescinded. Later, when he testified in his own behalf, his memory improved and, although he could not recall the date, he thought it was a day or two after July 25. Under the circumstances we believe the evidence is wholly inadequate to support the conclusion of the Master.

 Since we hold that the trial court properly rescinded the contract on account of fraud it is unnecessary to consider whether rescission was also justified for the alleged failure of the defendants to permit inspection of their books and records. If the trial court was correct in rescinding the contract it would also follow it did not err in dismissing defendants' counterclaim for breach of contract.

Defendants next argue the trial court erred in entering judgment against them for the real estate broker's commission ($13,000). In addition to the $5,000 down payment (which was made) the contract provided that the transaction would be closed (possession transferred) on July 31, 1962, at which time plaintiffs were required to make an additional payment of $25,000 and execute and deliver to defendants their promissory note in the amount of $13,000, the balance of the purchase price being payable in monthly installments. Another provision of the purchase contract provided, "The seller agrees to pay a broker's commission to Karlin Realty, Inc. in the amount of $13,000.00 by assigning to it without recourse the $13,000 note herein described, this being in full for all commission." As indicated earlier plaintiffs notified defendants on July 31, 1962, of their intention to rescind the contract and as a consequence, the $13,000 note was never executed and delivered by the plaintiffs.

Defendants argue that the broker's right to a commission depends solely on the contract provision. Such provision, according to defendants, provides that the commis-

sion is payable from the proceeds of the sale and only if there are such proceeds. There being no proceeds, it follows that they are not personally liable for any commission. Such argument assumes, and it is this assumption which the broker contends is fallacious, that the cause of the failure of the contingency is immaterial. In other words, so long as the seller received no proceeds from the sale, no commission is payable regardless of the fact that the conduct of the seller may have prevented any proceeds being available.

Although there do not appear to be any Illinois authorities dealing directly with this issue we believe the cases cited by the parties lay the foundation for its resolution.

■ The basic principles relating to brokers' commissions are set forth in the leading case of Fox v. Ryan, 240 Ill 391, 88 NE 974, and such case has been discussed by both parties in their briefs. Where the terms of employment between owner and broker provide that the broker's compensation is dependent upon a sale of the property the broker will be deemed entitled to his compensation if he secures a purchaser ready, willing and able to purchase the property on terms acceptable to the seller. If such a purchaser is secured by the broker he is entitled to his compensation and the owner may not defeat such right to compensation by declining or refusing to make the sale. If a sale's contract is entered into, it has the effect of establishing in the absence of fraud or misrepresentation by the purchaser, that the broker has secured a ready, willing and able buyer on terms acceptable to the seller. Whether or not the seller thereafter abandons such contract is immaterial. If no sale's contract is entered into, the broker will be required to prove that his prospective purchaser is ready, willing and able to buy on terms specified by the owner.

In the Fox case, which is the basis for the foregoing observations, a broker was employed to sell shares of

476

stock for a specified price, his commission to be five percent of the selling price. After unsuccessful negotiations with prospective purchasers suggested by the owner, the owner indicated that he would continue the negotiations himself and if a deal was made he promised to pay the broker $4,000 which compensation was acceptable to the broker. Thereafter a sale was made by the owner to the purchasers with whom the broker had been negotiating, the contract providing for a down payment and payment of the balance in deferred installments. The purchaser made the down payment but defaulted in the deferred payments and the contract was abandoned by the seller. Based on the reasoning set forth in the foregoing paragraph the broker was held to be entitled to his commission of $4,000.

■ ■ Although not an issue in the Fox case, one aspect of the general principles requires further consideration, namely the purchaser must be willing to purchase on terms acceptable to the owner. This means that the prospective purchaser is willing to undertake and perform all of the obligations as proposed by the owner. The amount and terms of payment of the broker's compensation is a matter of the employment contract between the owner and broker. In the absence of any contrary provision, the payment of such compensation is the responsibility of the owner. The employment contract like any other contract may be modified by agreement of the parties. Where the broker has secured a buyer ready, willing and able to purchase on terms proposed by the seller and such terms do not include assumption of the obligation to pay the real estate commission by such prospective buyer, the owner's refusal to consummate the sale may not defeat the broker's claim to compensation even though the time for payment thereof might have been determined with reference to some future event such as closing. The owner's refusal to do one act i. e.

make the sale, cannot relieve him of a responsibility, the time for performance of which is dependent thereon.

Likewise, in the instant case even though a contract had been entered into, we do not believe that the owners' conduct which prevented the occurrence of the event which determined the time of payment of the commission may relieve the owner of the responsibility for paying the broker's commission. While it is true that the broker had agreed to accept the personal obligation of the buyer, the note payable to seller endorsed without recourse, when the conduct of the seller prevents the obligation from coming into being, the seller is not thereby excused from liability for the commission.

Defendants have relied heavily on the case of Consolidated Trading Corp. v. Roth, 345 Ill App 551, 102 NE2d 551, which in turn relies on the case of Burnett v. Potts, 236 Ill 499, 86 NE 258. While these cases might be distinguished on the grounds that the employment contract provided for a net amount to be received by seller, broker's commission to be the excess over such amount, we also believe that such cases are of doubtful authority for the proposition that the seller's conduct is immaterial if it prevents the occurrence of an event upon which the payment of a broker's commission is contingent. In the Burnett case the issue is not discussed and is dismissed with the observation that the Appellate Court found that the seller was not at fault. An examination of the Appellate Court opinion, Burnett v. Potts, 143 Ill App 160, reveals that the Appellate Court did not consider the issue and made no such finding. In the Consolidated Trading case the court held that the failure of the buyer to perform was not due to fraudulent representations to him by the seller and inferentially at least, it might be suggested that if fraud had existed the decision might have been different. Further the court appears to have held in

Consolidated that the contract upon which the broker's claim for commission was based was not a sale of all of the shoes as claimed by broker.

We believe Crane v. Eddy, 191 Ill 645, 61 NE 431, a case cited by the broker, supports our views although the precise issue presented by this case was not therein involved. In the Crane case the defendant owner sold the property on a deferred payment basis by transferring title thereto and taking back a trust deed securing notes representing the deferred balance. At the same time, the owner executed a note to the real estate broker in the amount of and for his commission, which provided that the payments thereon would be made in proportion to the amounts which the owner received from his buyer. The buyer defaulted, the trust deed was foreclosed and the owner purchased the property at the foreclosure sale. The precise issue decided by the court was that under the circumstances the owner had received the proceeds of the sale. It might be suggested, although we do not so hold, that if repossession of the property by the owner is equivalent to receipt of proceeds, the retention of the property by the owner might also be so considered. However, there is another aspect of the Thomas case which although dicta, we believe is of some significance. When the buyer made partial payments the owner made partial releases of the real estate from the lien of the trust deed which was not required by its terms. The court observed that the partial release of the trust deed without the assent of the broker could have affected the owner's receipt of the proceeds of the sale and if so the owner might be liable as a consequence thereof.

Accordingly we find that the trial court did not err in awarding judgment against the defendants for the real estate commission.

During the pendency of this appeal the defendants filed their motion requesting that the cause so far as it related

to their liability for the broker's commission, be remanded to the trial court on the grounds that newly discovered evidence had been found. Although we have some question concerning the propriety of seeking such relief at this late date it is our view that no reason exists for remandment in view of our decision and the reasons therefore as set forth in this opinion. After the contract of July 11, 1962, was executed it was modified by providing that if the plaintiffs failed to sell a certain described property which they owned prior to July 31st, the date of the closing, the plaintiffs if they so elected, could transfer such property to the defendants at an agreed valuation of $15,000 to be accepted as part payment of the $25,000 required on July 31. The newly discovered evidence is a letter from the broker to the defendants in which the broker outlines alternative methods of payment of his commission if such property were to be transferred to the defendants in lieu of the payment required. It is apparent that the conduct of defendants was equally responsible for the failure of the event to occur and therefore such letter would have no bearing on the propriety of the trial court's judgment.

For the foregoing reasons the judgments of the Circuit Court of Cook County are affirmed.

Judgments affirmed.

ALLOY and SCHEINEMAN, JJ., concur.