**E.B. HARPER & COMPANY, INCORPORATED, Plaintiff–Appellant,**

v.

**NORTEK, INCORPORATED, Defendant–Appellee.**

No. 95–3948.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1996.

Decided Jan. 13, 1997.

914

Bend Millwork; as part of the consideration for the acquisition, Nortek agreed to pay the Pozzis yearly "earn-out payments," defined as a percentage of the company's net earnings over a five-year period. Under its fee agreement with Nortek, Harper was entitled to an amount equal to 1% of any earn-out payments disbursed.

The relationship between Nortek and the Pozzis soured when the company failed to make money. The Pozzis then sued Nortek in Oregon state court. They alleged in part that Nortek breached the contracts related to the sale. The complaint attributed the company's lack of profitability to Nortek's breach. The Pozzis prayed for damages in the amount of earn-out payments they would have reaped had the company been profitable. The Oregon jury returned a verdict for the Pozzis, but the parties settled the case while the appeal was pending.

Upon discovering the results of the Oregon litigation, Harper's president, Ernest B. Harper, Jr., wrote to Nortek and requested to be paid a commission equal to 1% of the amount the Oregon jury awarded the Pozzis. When Nortek refused, Harper brought this action in the district court. Harper contended that the Oregon judgment had awarded the Pozzis earn-out payments. In Harper's view, the Oregon judgment establishes, by virtue of collateral estoppel, that Nortek owed the Pozzis earn-out payments and therefore that Harper is entitled to damages equaling 1% of the jury's award on the breach of contract claim. For the reasons set forth in the following opinion, we agree with the district court that collateral estoppel does not apply and accordingly affirm the district court's judgment.

David A. Genelly (argued), John C. Corrigan, Fishman & Merrick, Chicago, IL, for Plaintiff-Appellant.

Robert T. Palmer (argued), Chicago, IL, for Defendant-Appellee.

Before COFFEY, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

E.B. Harper & Co. ("Harper") is a business finder that charges a fee for introducing its clients to companies interested in buying, selling or merging. Harper introduced Nortek, Inc. to the Bend Millwork Companies and its principals, Arthur A. Pozzi and Randall A. Pozzi. Nortek eventually bought

## I

### BACKGROUND

A. *Facts*

Harper acts as a business finder, a company that researches buyers and sellers of businesses. Harper introduces those buyers and sellers that it hopes will consummate a transaction; it earns a fee only if the introduction results in a sale. Nortek is a conglomerate

company, engaged in various construction-related activities through numerous subsidiaries. On October 28, 1985, Harper notified Nortek that it knew of a potential candidate for acquisition, Bend Millwork. As was its practice, Harper proposed to introduce and to reveal details about the company if Nortek agreed to pay Harper "1% of the total considerations involved, payable in cash on closing" should Nortek purchase Bend Millwork. R. 30, Ex. A. Nortek agreed to this arrangement and proceeded to enter into negotiations with Bend Millwork's owners, Arthur and Randall Pozzi.

On March 31, 1986, Nortek purchased Bend Millwork from the Pozzis. The purchase gave rise to five separate contracts: (1) the Bend Millwork Company Stock Purchase Agreement; (2) the Arthur A. Pozzi Employment and Consulting Agreement; (3) the Randall A. Pozzi Employment Agreement; (4) the Arthur A. Pozzi Company Stock Purchase Agreement; and (5) the Bend Millwork Distributorship Agreement. Nortek assumed various duties under these contracts. Under the two employment agreements, for example, Nortek promised to employ the Pozzis in managerial positions. The principal document, the Bend Millwork Stock Purchase Agreement ("Stock Purchase Agreement"), set forth the consideration to be paid by Nortek: cash, promissory notes, common stock in Nortek and "earnout." Earn-out was defined as "payments based upon future earnings"; specifically, the earn-out provision of the contract afforded the Pozzis the

> right to receive payments based upon future earnings of [Bend Millwork] as follows: (a) Nortek will pay to the [Pozzis] their pro rata share of an amount equal to 30 percent of the Net Earnings of the Company (as hereinafter defined) which exceed in any year $8,000,000 for each of the years ending December 31, 1986 through 1990 without regard to losses in

any prior year during such period; provided that in no event shall the total of such payments exceed $8,000,000 (the "Maximum Earn-out")....

R. 30, Ex. B at ¶ 2.4(a). "Net Earnings of the Company" was defined in the contract and included "the consolidated [pre-tax] net earnings of [Bend Millwork], its subsidiaries and the business of Arthur A. Pozzi Company being acquired simultaneously herewith." R. 30, Ex. B at para. 2.4(b). In addition, the Stock Purchase Agreement proscribed "change to a material extent [in] the nature of the business of" Bend Millwork "[p]rior to the payment to the [Pozzis] of the Maximum Earnout, or December 31, 1990, whichever shall first occur." R. 30, Ex. B at para. 2.4(c).

Upon closing, the consideration due the Pozzis, excluding the continuing earn-out obligation, was valued at approximately $25 million. As a result, Nortek paid Harper 1% of this amount, or $249,065.08, as a finder's commission, due under the Harper–Nortek agreement. In addition, Nortek assured Harper by letter dated June 4, 1986 that, "in the event 'earnout payments' are made to Arthur Pozzi[, Harper] will be entitled to a one percent fee on any additional amounts paid." R. 30, Ex. D.[1] Harper did not receive any additional fee payment. Under Nortek's management, Bend Millwork failed to make a profit. Consequently, claiming insufficient profitability, Nortek failed to make earn-out payments to the Pozzis. Attributing the failure to earn a profit, and the resulting failure to pay earn-out, to contractual breaches (including Nortek's mismanagement of Bend Millwork and its refusal to place the Pozzis in positions of authority), the Pozzis brought a suit against Nortek in Oregon Circuit Court.

## B. The Oregon Litigation

The Pozzis' Oregon complaint contained four claims for relief: (1) breach of contract;

---

1. As previously noted, the original Harper–Nortek letter agreement states that Harper's "fee is 1% of the total considerations involved, payable in cash *on closing*." R. 30, Ex. A (emphasis added). Nortek does not argue that this language precludes Harper's recovery of a percentage of earn-out payments, which were payable *post-closing*. Indeed, both parties have conceded that the June 4, 1986 letter, confirming the par-

ties' earlier agreement, constitutes an enforceable obligation. *See* Tr. at 200 (district court noting that Nortek could have argued that Harper was not entitled to post-closing payments but failed to do so). We therefore shall treat the June 4, 1986 letter as a binding obligation for Nortek to pay Harper a fee in the event earn-out was paid.

(2) intentional interference with economic relations; (3) fraud and tortious bad faith and unfair dealing; and (4) declaratory judgment. The breach of contract claim alleged initially that Nortek owed to the Pozzis the duty of employing them in managerial positions. Furthermore, the Pozzis alleged, the contracts required that Nortek, because of its failure to employ the Pozzis, either pay the Pozzis the maximum earn-out of $8 million or manage Bend Millwork competently enough to enable the Pozzis to earn the maximum earn-out of $8 million. Therefore, among the breaches claimed by the Pozzis were Nortek's exclusion of the Pozzis from active participation in the management of Bend Millwork and Nortek's failure to manage the company competently enough to enable the Pozzis to earn the maximum $8 million earn-out. The Pozzis further claimed that Nortek changed, to a material extent, the nature of the company's business before paying the maximum earn-out and before December 31, 1990 by expanding Bend Millwork's geographical territory, by failing to employ the Pozzis in managerial positions, by terminating the manufacture of six-panel interior pine doors, by changing the production methods of Bend Millwork and by adding to the product line. The Pozzis alleged that, as a result of these breaches, they had lost income, bonuses, the $8 million earn-out which they would have made had Nortek competently managed Bend Millwork, and other amounts related to various obligations undertaken by Nortek during the sale of Bend Millwork.

Following a trial that lasted six weeks, the jury returned a verdict in favor of the Pozzis for over $20 million, an amount including $8,352,000 for breach of contract.[2] In addition to damages for breach of contract, the jury awarded the Pozzis $4 million on the fraud claim and an additional $10 million in punitive damages; Randall Pozzi, individually, received an additional $28,030 for Nortek's breach of a stock sell-back contract. The court then granted Nortek's motion for judgment n.o.v. with respect to the jury's award of punitive damages. After various post-trial proceedings, the trial court entered

a final judgment on the breach of contract claim in the amount of $8,352,000. The total amount of the judgment, including fraud damages, attorney's fees and costs, exceeded $13 million.

Both parties appealed the judgment to the Oregon Court of Appeals. After oral argument but before the issuance of a decision, Nortek and the Pozzis settled their dispute. The settlement agreement also resolved three other lawsuits, related to the Oregon litigation, that the parties had filed against each other. The agreement provided further: "[The] Settlement Agreement and the documents executed by the parties pursuant thereto are intended to compromise and to settle disputed claims. This is not an admission of liability or fault by any party." R.30, Ex. I at 6 para. 5. The parties intended the agreement to be completely integrated and to "settle their differences ... without an admission of fault or liability." *Id.* at 2–3 para. E. Pursuant to the agreement, Nortek paid $11.8 million in full settlement of the Oregon judgment and the related litigation. Although the case was settled, the final judgment entered by the trial court was not vacated; the Oregon Court of Appeals instead modified it, as requested, by including as parties the insurance companies with whom Nortek had contracted to provide surety for the appeal bond.

### C. *The Present Litigation*

Upon learning of the Oregon litigation and subsequent settlement, Harper's president contacted Nortek and indicated that an additional commission was due. When Nortek responded that the settlement did not involve the payment of earn-out, Harper brought this action in the district court. Harper's amended complaint alleged that the Oregon jury had awarded the Pozzis $8 million for the earn-out compensation lost due to Nortek's mismanagement and Nortek's refusal to permit the Pozzis to manage Bend Millwork. The mismanagement, Harper alleged, resulted in fewer profits than expected and therefore denied the Pozzis the earn-out compen-

---

**2.** This breach of contract verdict was based on an affirmative answer to a special interrogatory which read, "Did defendants breach or fail to act in good faith and deal fairly with respect to any of the stock purchase or employment agreements as alleged in the complaint[?]" R. 30, Ex. F.

sation they had expected to receive under the agreement. Harper went on to allege that, by settling the dispute for over $11 million, Nortek paid the Pozzis the equivalent of $8 million in earn-out sales compensation. In essence, Harper complained that it was entitled to an $80,000 commission because the settlement was an earn-out payment or its equivalent.

Before the district court, Harper insisted that Nortek was collaterally estopped from arguing that Nortek had not breached the sales agreements with the Pozzis by failing to make earn-out payments. In Harper's view, the Oregon judgment, by finding a breach of the sales agreements, also established an obligation on the part of Nortek to pay earn-out. Harper maintained that the eventual settlement did not affect this obligation; the jury had commanded Nortek to pay earn-out to the Pozzis, and in the process, had established Harper's right to a commission.

The district court disagreed, holding that collateral estoppel was inapplicable because the issues decided in Oregon were different from the issues in the present litigation. The court construed Harper's contract to entitle Harper to a fee only if earn-out, or its equivalent, was paid. The court found that, even if the Oregon jury had determined that the Pozzis were entitled to earn-out, the judgment did not determine that earn-out, or its equivalent, actually had been paid. The only money that Nortek had paid to the Pozzis was $11.8 million in settlement proceeds.

The issue, determined the district court, was therefore whether the $11.8 million could properly be characterized as earn-out or its equivalent. The court concluded that a portion of the settlement was equivalent to earn-out, the portion that had compromised the $8 million breach of contract claim. As a result, the court endeavored to apportion the settlement. After a bench trial, the court determined that Harper had not carried its burden of proving which part of the settlement compromised the $8 million judgment for breach of contract. The district court then concluded that apportionment was impossible: Although the final judgment in Oregon was for just over $13 million, the original jury verdict had been for over $20 million;

the Pozzis were appealing the Oregon trial court's grant of judgment n.o.v. on the $10 million punitive damages award; and Nortek was appealing, in addition to the $8 million breach of contract award, adverse judgments on the Pozzis' fraud claims. In addition, both parties, in the settlement agreement, disclaimed all liability and fault. Moreover, the agreement settled three other lawsuits. In essence, the district court held that the fee agreement would entitle Harper to that portion of the settlement attributable to the $8 million award for lost earn-out payments because this amount was equivalent to "earn-out paid." However, because Harper could not prove what portion of the settlement was attributable to lost earn-out, the court was faced with a failure of proof and awarded Harper nothing.

## II

## DISCUSSION

On appeal, Harper renews its contention that the Oregon judgment entitles it to an $80,000 commission. In its view, the Oregon jury determined that Nortek breached its sales agreement with the Pozzis by failing to pay $8 million earn-out. The district court, submits Harper, should not have examined the $11.8 million settlement in order to determine how much of it was actual earn-out or how much of it represented the compromise reached on the $8 million award at issue. Harper suggests that the settlement amount is irrelevant because the Oregon judgment establishes that the Pozzis were entitled to $8 million as additional consideration in the form of earn-out payments. Indeed, it concedes that apportionment of the settlement is impossible and, as a result, is appealing solely the collateral estoppel issue.

Nortek, on the other hand, maintains that the Oregon jury found that Nortek breached duties owed exclusively to the Pozzis. Nortek insists that Harper cannot claim a right to recover based on a breach of these duties because Harper is not a third-party beneficiary of the Nortek–Pozzi contract. Moreover, Harper's contract does not extend independently those duties to Harper. Nortek also agrees with the district court that no

part of the settlement can be allocated definitively to the $8 million lost earn-out award. In Nortek's view, however, whether an allocation could be made is unimportant; Harper's contractual right to an additional commission never ripened because the Pozzis' payment consisted of settlement proceeds, not earn-out as defined in the Stock Purchase Agreement.

These contentions raise several issues. First, we must determine, in light of the elements that must be proven to make successfully a prima facie case for breach of contract in Illinois, the facts that Harper must prove to recover a commission. Then we must ascertain whether the Oregon judgment has a preclusive effect in this litigation. This task requires that we identify the issues that were necessarily decided in Oregon because they were essential to the judgment. After comparing those issues to the issues sought to be proved in this case, we must determine whether the issues in both cases are the same. Because of our resolution of these matters, we need not reach the issue of whether the settlement of the Oregon judgment affected the finality of that judgment for collateral estoppel purposes.

A. *Harper's Breach of Contract Claim*

■■■■ Harper's complaint alleges the breach of a fee agreement. The contract at issue provides that it is to be interpreted under Illinois law. In Illinois, to prove a prima facie case for breach of contract, a party first must prove an offer, an acceptance and consideration. *Ogle v. Hotto,* 273 Ill.App.3d 313, 210 Ill.Dec. 13, 17, 652 N.E.2d 815, 819 (1995). In addition, if a broker's contract conditions the payment of a commission on some event, that condition generally must occur before the broker is entitled to payment. *Barry Mogul & Assocs. v. Terrestris Dev. Co.,* 267 Ill.App.3d 742, 205 Ill.Dec. 294, 300–03, 643 N.E.2d 245, 251–54 (1994); *Hallmark & Johnson Properties, Ltd. v. Gadea,* 218 Ill.App.3d 921, 161 Ill.Dec. 534, 538, 578 N.E.2d 1180, 1184 (1991); *Borrowdale v. Shepherd,* 94 Ill.App.2d 1, 236 N.E.2d 436, 438 (1967). If the condition precedent fails to occur, the party seeking to enforce the contract must prove that the condition should

be excused and the contract enforced absent the limitation. For instance, a party typically cannot rely on the failure of a condition precedent if that party is responsible for hindering the occurrence of the condition through uncooperative conduct. *Unit Trainship, Inc. v. Soo Line R.R.,* 905 F.2d 160, 162–63 (7th Cir.1990).

■■■■ Furthermore, a duty of good faith and fair dealing is implied in every contract in Illinois. *Case v. Forloine,* 266 Ill.App.3d 120, 203 Ill.Dec. 256, 261, 639 N.E.2d 576, 581 (1993). Good faith and fair dealing requires that parties use reasonable efforts to bring about the occurrence of conditions precedent within their control. *Id.* The duty is an implied promise between the parties that they will not do anything to injure the other party's right to enjoy the benefits of the contract. *Grant v. Board of Educ.,* 282 Ill. App.3d 1011, 218 Ill.Dec. 356, 365, 668 N.E.2d 1188, 1197 (1996). In the context of brokerage agreements, although a broker is generally not entitled to a commission unless all conditions precedent occur, when the purchaser's own conduct "prevent[s] the occurrence of the event which determine[s] the time of payment of the commission . . . ., the [purchaser] is not thereby excused from liability for the commission." *Webster v. Hochberg,* 105 Ill.App.2d 466, 245 N.E.2d 529, 535 (1969).

With these principles in mind, we now turn to Harper's complaint. To determine the facts that Harper would be required to establish in order to prevail on his breach of contract claim, we must interpret Nortek's promise as contained in the June 4, 1986 letter: "[I]n the event 'earn-out payments' are made to Arthur Pozzi[, Harper] will be entitled to a one percent fee of any additional amounts paid." R. 30, Ex. D. This unambiguous language creates a condition precedent to the payment by Nortek to Harper of an additional commission "in the event 'earn-out payments' are made." Therefore, to prevail, Harper must prove that earn-out payments were made to Arthur Pozzi, or alternatively, that Nortek is at fault for not using good faith and reasonable efforts in making earn-out payments.

In order to determine whether earn-out was paid, Illinois law requires us to turn to the document that defines "earn-out," the Stock Purchase Agreement. *Barry Mogul,* 205 Ill.Dec. at 300, 643 N.E.2d at 251. "Earn-out" is defined in that text as thirty percent of net profits over a five-year period, with an $8 million cap under the provision. Consequently, to prove it is entitled to $80,-000 under the theory that earn-out payments were actually made, Harper must prove that Nortek paid the Pozzis $8 million because Nortek generated sufficient earnings to compel contractually the payment of a percentage of those earnings.[3]

▮ In the alternative, Harper could prove itself entitled to earn-out although no " 'earn-out payments' [were] made" by proving that the condition precedent is excused by misconduct on the part of Nortek. Harper would need to show, in some form, that Nortek refused to make existing earn-out payments to the Pozzis, *see Webster,* 245 N.E.2d at 535–36, or failed to use reasonable efforts to pay earn-out to the Pozzis, *see Osten v. Shah,* 104 Ill.App.3d 784, 60 Ill.Dec. 497, 433 N.E.2d 294 (1982). However, it would not be enough for Harper to show merely that Nortek's actions negatively affected net earnings; Nortek's actions must amount to bad faith or lack of reasonable efforts. The fee agreement with Harper did not require that Nortek wear blinders, forsaking all risks in an effort to ensure that a commission was paid to Harper, because "[t]he obligation to use one's best efforts on behalf of another does not require the obligor to ignore its own interests." *Grant,* 218 Ill.Dec. at 365, 668 N.E.2d at 1197. In sum, Illinois courts would excuse the condition that earn-out be paid only if Harper could prove that Nortek failed to use reasonable efforts to make, or acted in bad faith toward Harper to deny, a percentage of net earnings to the Pozzis.[4] With Harper's legal and fac-

---

3. Without reference to the obligation of good faith and fair dealing imposed by Illinois law, Harper maintained at trial, and the district court agreed, that Harper was entitled to a commission not only if actual earn-out was paid but also if its "equivalent" was paid. In similar contexts, courts have held that brokers are not entitled to a percentage of settlement proceeds when their contracts condition the payment of commissions on profits or sales. *See Segal Brokerage Co. v. Lloyd L. Hughes, Inc.,* 96 F.2d 208 (9th Cir.1938); *Tankers Int'l Navigation Corp. v. National Shipping & Trading Corp.,* 116 A.D.2d 40, 499 N.Y.S.2d 697 (N.Y.App.Div.1986); *R.J. Caldwell Co. v. Connecticut Mills Co.,* 225 A.D. 270, 232 N.Y.S. 625 (N.Y.App.Div.), *aff'd,* 251 N.Y. 565, 168 N.E. 429 (1929). Some courts have held that, when the party responsible for paying the commission receives monetary benefits equivalent to contractual performance, the broker can recover a percentage of that benefit, *see Kuhn v. Spatial Design, Inc.,* 245 N.J.Super. 378, 585 A.2d 967, 973 (App.Div.1991); *Kane v. Neptune Shipping,* 274 A.D. 28, 79 N.Y.S.2d 396, 402 (N.Y.App.Div.1948); but in this case, the party responsible for paying the commission, Nortek, received no benefit equivalent to net earnings.

Any ambiguity in Illinois law in this regard need not detain us. For present purposes, the important point is that the Pozzis and Nortek did not litigate in Oregon whether the settlement was equivalent to earn-out or whether Harper's contract extended to payments equivalent to earn-out. Therefore, collateral estoppel, the only issue raised in this appeal, offers no help to Harper. The Oregon judgment would be useful in determining whether the settlement was equivalent to earn-out because analyzing the judgment would reveal the nature of the settlement. Harper, however, faults the district court for analyzing the settlement and made clear in its brief and at oral argument that apportionment is not being raised on appeal. We therefore consider the issue waived. *Griman v. Makousky,* 76 F.3d 151, 153 (7th Cir.1996).

4. Before proceeding further, we note that Harper does not allege that it is a third-party beneficiary of the agreement between the Pozzis and Nortek. Even were we to construe, under our liberal notice pleading requirements, Harper's complaint to include such an allegation, Illinois law forecloses the claim. "In order for a third party to have a right to sue, '[t]he contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear.'" *Barney v. Unity Paving, Inc.,* 266 Ill.App.3d 13, 203 Ill.Dec. 272, 276, 639 N.E.2d 592, 596 (1994) (quoting *Waterford Condominium Ass'n v. Dunbar Corp.,* 104 Ill.App.3d 371, 60 Ill.Dec. 110, 112, 432 N.E.2d 1009, 1011 (1982)). If the intent is not express on the face of the contract, "its implication at least 'must be so strong as to be practically an express declaration.'" *Id.* (quoting *Ball Corp. v. Bohlin Bldg. Corp.,* 187 Ill.App.3d 175, 134 Ill.Dec. 823, 824, 543 N.E.2d 106, 107 (1989)). These basic principles apply to brokerage contracts; brokers are generally not third-party beneficiaries of sales agreements to which they are not a party. *Glassberg v. Warshawsky,* 266 Ill.App.3d 585, 202 Ill.Dec. 881, 887, 638 N.E.2d 749, 755 (1994); *David v. J. Elrod Realtors on Devon, Inc.,* 75 Ill.App.3d 449, 31 Ill.Dec. 381, 394 N.E.2d 583 (1979). In this case, Harper is mentioned only

tual burdens in mind, we turn to the question whether the Oregon jury decided any of the necessary factual predicates in Harper's favor.

## B. *Collateral Estoppel*

■ We first must determine which jurisdiction's body of law controls the resolution of the collateral estoppel issue. We begin with the Full Faith and Credit Act, which provides that the "judicial proceedings" of any state "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State." 28 U.S.C. § 1738. The Supreme Court has announced that the Act "directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state." *Matsushita Elec. Indus. Co. v. Epstein,* — U.S. —, —, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996); *Majeske v. Fraternal Order of Police, Local Lodge No. 7,* 94 F.3d 307, 312 (7th Cir.1996). Thus, we look to the preclusion law of Oregon to determine the preclusive effect of an Oregon judgment in federal court. *See Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985).

### 1.

■ Estoppel by judgment takes two forms: collateral estoppel, or issue preclusion; and res judicata, or claim preclusion. Collateral estoppel, the form at issue in this case, arises when an issue has been determined by a prior adjudication. Oregon courts apply standard principles of issue preclusion. *Dodd v. Hood River County,* 59 F.3d 852, 861 (9th Cir.1995). More specifically, Oregon preclusion law prevents the relitigation of issues decided in prior proceedings if five requirements are met:

1. The issue in the two proceedings is identical.

2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.

3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

5. The prior proceeding was the type of proceeding to which [Oregon] court[s] will give preclusive effect.

*Nelson v. Emerald People's Util. Dist.,* 318 Or. 99, 862 P.2d 1293, 1296–97 (1993) (citations omitted). However, even when all five requirements are present, Oregon courts will not apply collateral estoppel if "it would be unfair to preclude [the party] from relitigating the issue." *Bahler v. Fletcher,* 257 Or. 1, 474 P.2d 329, 334 (1970) (in banc). Whether the application of collateral estoppel would result in actual unfairness is determined "under all the circumstances of the particular case." *Id.* Unfairness may arise when the party sought to be precluded "does not realize that subsequent litigation is in the offing," or when multiple claimants await a favorable judgment before instituting their causes of action. *Id.* 474 P.2d at 334, 338. Moreover, although mutuality is no longer required to invoke collateral estoppel in Oregon, it is a consideration in assessing whether it would be fair to do so. *Shannon v. Moffett,* 43 Or.App. 723, 604 P.2d 407, 411 (1979). But no one factor is dispositive; "[c]ourts ... should scrutinize with care any situation where collateral estoppel is asserted by a person who was neither a party nor in privity with a party to the first case, to make certain no unfairness will result to the prior litigant if the estoppel is applied." *Bahler,* 474 P.2d at 338. We now turn to whether Oregon would apply issue preclusion against Nortek.

---

incidentally in the Stock Purchase Agreement between Nortek and the Pozzis as the broker involved in the deal. The sale of Bend Millwork was not undertaken for Harper's direct benefit. Moreover, the Stock Purchase Agreement does not imply Harper is to benefit directly, nor was such an intention explicitly included in the contract. The record demonstrates that the contract

for sale was entered into for the benefit of the Pozzis and Nortek; Harper incidentally received a mere 1% of the consideration Nortek eventually paid to the Pozzis. Therefore, Harper must rely on the duties created by its contract with Nortek if it wishes to recover; it may not avail itself, as a third-party beneficiary, of the duties owed to the Pozzis.

## 2.

In this case, Harper, as the party asserting collateral estoppel, "has the burden of proving the elements [that] giv[e] rise to it." *State Farm Fire & Casualty Co. v. Century Home Components, Inc.*, 275 Or. 97, 550 P.2d 1185, 1188 (1976). We conclude that Harper has failed to fulfill this burden with respect to proving that the issues decided in Oregon and the issues presented in this case are identical. As a result, the prerequisites giving rise to the applicability of collateral estoppel are not all present, and we need not determine whether the other requirements for the doctrine's applicability exist.[5]

Whether the issues are identical is a question of law. *See Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 571–72, 71 S.Ct. 408, 415–16, 95 L.Ed. 534 (1951); *State Farm Fire & Casualty Co.*, 550 P.2d at 1188. To resolve the question, we examine the materials submitted, the record, pleadings, exhibits and transcripts, to determine the facts and issues decided in the Oregon litigation. *See Emich Motors Corp.*, 340 U.S. at 571–72, 71 S.Ct. at 415–16; *State Farm Fire & Casualty Co.*, 550 P.2d at 1188. We have already determined that, to prevail in this case, Harper must prove either that earn-out was paid or that the cause of earn-out not being paid was Nortek's bad faith or lack of reasonable efforts. Neither is established by the Oregon judgment.

Indeed, the Oregon litigation forecloses the former factual allegation because the judg-ment establishes that earn-out was not actually paid. The Pozzis' Oregon complaint alleged that Nortek failed to make earn-out payments. Further, the complaint explained that, as a result of the wrestling away of managerial control, Nortek and Bend Millwork accumulated no net earnings and thereby disabled the operation of the earn-out provision of the Stock Purchase Agreement. Similarly, the members of the Oregon jury could not have found that earn-out had been paid. Both parties agreed at trial that Bend Millwork had no net earnings over the relevant years; the jury was instructed by the Oregon trial court that the Pozzis were entitled to breach of contract damages only if the jury found that the lack of net earnings and resulting earn-out obligation could be attributed to Nortek's breach. Moreover, the Pozzis submitted in closing argument that Bend Millwork lost money, thereby depriving the Pozzis of earn-out payments. Indeed, that earn-out was not paid formed the core of the Pozzis' claims in Oregon; it is the reason they prayed for, and the measure by which they calculated, damages.[6]

Alternatively, as we have already noted, Harper could benefit from the Oregon litigation were the judgment to establish that Nortek failed to take reasonable steps to pay earn-out. *See Jones v. Seiwert*, 164 Ill. App.3d 954, 115 Ill.Dec. 869, 872, 518 N.E.2d 394, 397 (1987); *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 170, 466 N.E.2d 958, 972 (1984) (party required to use

---

**5.** Harper spends much of its brief arguing that the Oregon judgment, notwithstanding its subsequent compromise and settlement, is a final determination for collateral estoppel purposes. *See Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1190–91 (5th Cir.1982), *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983); *Wellons, Inc. v. T.E. Ibberson Co.*, 869 F.2d 1166, 1169 (8th Cir.1989). We do not know whether Oregon courts, faced with a judgment settled on appeal, would follow *Chemetron* and *Wellons. See Koos v. Roth*, 43 Or.App. 383, 602 P.2d 1128, 1130 & n. 4 (1979) (citing *Lea v. Shank*, 5 Cal.App.3d 964, 85 Cal. Rptr. 709 (1970)). The Oregon judgment in this case, though not vacated on appeal and left intact in all relevant aspects, was settled by an agreement in which Nortek denied all liability or fault. *Compare Harper v. Sizemore–Burke, P.C.*, 115 Or.App. 502, 838 P.2d 1106, 1107 n. 2 (1992) (no preclusive effect from vacated judg-ment) *with Gordon H. Ball, Inc. v. Oregon Erecting Co.*, 273 Or. 179, 539 P.2d 1059, 1063 (1975) (in banc) (consent judgments conclusive to the same extent as judgments rendered at contested trial). Because we find that issue identity is sufficiently lacking in this case, we decline the invitation to decide whether Oregon would treat the judgment at issue final for preclusive purposes.

**6.** We also note that our examination of the record indicates that no actual earn-out was, or has ever been, paid to the Pozzis. The Stock Purchase Agreement defines earn-out as a percentage of net earnings. Bend Millwork had no earnings from which to pay earn-out. The only payment that has been made to the Pozzis was the settlement Nortek reluctantly relinquished; it was certainly not a portion of money made during the relevant five-year period.

"reasonable efforts" to bring about condition). Harper has not carried its burden of proving that this fact "has necessarily been decided in the prior action." *Bahler*, 474 P.2d at 338 (emphasis added). The myriad of contractual breaches for which the Oregon jury potentially found Nortek liable includes: refusing to employ the Pozzis in managerial positions, changing the nature of Bend Millwork's business, expanding Bend Millwork's geographical territory, terminating the manufacture of six-panel interior pine doors, changing the production methods of Bend Millwork, altering the product line and failing to manage Bend Millwork competently enough to enable the Pozzis to receive maximum earn-out. These obligations, however, were duties derived from a contract to which Harper was neither a party nor a third-party beneficiary. *See Barney v. Unity Paving, Inc.*, 266 Ill.App.3d 13, 203 Ill.Dec. 272, 276, 639 N.E.2d 592, 596 (1994). Harper, therefore, cannot claim to be owed the specific duties recited in the Pozzi–Nortek contract. *See David v. J. Elrod Realtors on Devon, Inc.*, 75 Ill.App.3d 449, 31 Ill.Dec. 381, 383, 394 N.E.2d 583, 585 (1979). Harper was owed the implied, noncontractual duties of "reasonable efforts" and "good faith." But we shall not impute wholesale the specific contractual undertakings between the Pozzis and Nortek into the common law of contracts of the State of Illinois.

Accordingly, we must conclude that the Oregon litigation did not necessarily establish that Nortek failed to use reasonable efforts to earn money and to pay earn-out. Nortek reasonably may have believed that Bend Millwork would be more profitable without the Pozzis in management positions. And the duty to utilize "reasonable efforts" to earn money and to pay earn-out does not forbid, as a matter of law, changing the nature of the company, expanding the company's geographical market, altering production methods or changing product lines. *See Osten v. Shah*, 104 Ill.App.3d 784, 60 Ill.Dec.

497, 499, 433 N.E.2d 294, 296 (1982) (remanding case for trier of fact to determine whether efforts were reasonable). We are unable to say, nor did the Oregon judgment necessarily establish, which specific contractual undertakings Nortek performed and which ones it failed to perform. Without such a determination, we certainly cannot say that a finding that Nortek failed to employ reasonable efforts to earn profits was essential to the Oregon judgment. In relation to the Pozzis, the Oregon jury found that Nortek's actions were contractually impermissible, but it did not find necessarily that Nortek's actions amounted to an objectively unreasonable effort to yield profits. Similarly, the Oregon judgment does not include the determination that Nortek acted in bad faith toward Harper. Our examination of the record of the Oregon proceeding convinces us that whether the losses were the result of Nortek's thwarting Harper's fee agreement was not an issue before the Oregon jury.[7]

 Even if some of Nortek's behavior toward the Pozzis is relevant to the issue of whether Nortek used objectively reasonable efforts to enable Harper to enjoy the fruits of the fee arrangement, the multiplicity of grounds upon which the Oregon breach of contract judgment could rest precludes the application of collateral estoppel. *See Ditton v. Bowerman*, 117 Or.App. 483, 844 P.2d 919, 922 (1992). We believe the courts of Oregon would decline to apply collateral estoppel under these circumstances because of the high risk of actual unfairness. In this case, Harper seeks to apply non-mutual, offensive collateral estoppel in an instance in which there is much ambiguity surrounding issue identity; and it is unclear from the Oregon record whether and to what extent Nortek's actions against the Pozzis are relevant to the implied duties Nortek owed Harper. Moreover, the appeal of the judgment that Harper offensively asserts was eventually dismissed,

---

7. In fact, we find untenable the position that Nortek purposefully employed efforts designed to lessen net earnings so as to avoid its 1% obligation to Harper. Indeed, the district court independently found that Nortek was not motivated in any way by a desire to avoid its arrangement with Harper. *See Beraha, M.D. v.*

*Baxter Health Care Corp.*, 956 F.2d 1436, 1444 (7th Cir.1992) (good faith requires party to exercise discretion "reasonably, *with proper motive* and in a manner consistent with the reasonable expectations of the parties" (emphasis added)).

though not vacated, pursuant to a settlement agreement in which Nortek denies liability. Under all the circumstances of this particular case, it would be unfair to award Harper $80,000 on the basis of non-mutual, offensive collateral estoppel. *See Bahler,* 474 P.2d at 334; *Shannon v. Moffett,* 43 Or.App. 723, 604 P.2d 407 (1979); *Koos,* 602 P.2d at 1130 & n. 4.

In reaching this conclusion, we do not decide whether Nortek exercised good faith and reasonable efforts to make earn-out payments. We hold merely that, because exercising "good faith" and "reasonable efforts" does not include as a matter of law the duties created by a contract to which the plaintiff is neither a party nor a third-party beneficiary, the Oregon judgment in this case is not preclusive.

## Conclusion

For the reasons in the foregoing opinion, we affirm the judgment of the district court.

AFFIRMED